Richard R. Thomas, AZ Bar No. 010484
**SMITH LC**
40 North Center Street, Suite 104
Mesa, AZ 85201
T: (480)361-8575
F: (480)350-7309
E: rthomas@smith-lc.com

Todd Burgess
Lindsi Weber
THE BURGESS LAW GROUP
3131 E. Camelback Rd., Suite 224
Phoenix, AZ 85016
T: (602) 806-2100
E: Todd@theburgesslawgroup.com
E: Lindsi@theburgesslawgroup.com

*Attorneys for Plaintiffs, Bermite Recovery, LLC*
*and Remediation Financial, Inc.*

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>SANTA CLARITA, LLC | Proceedings Under Chapter 11<br><br>Case No.: 2:20-bk-12402-MCW |
| REMEDIATION FINANCIAL, INC., an Arizona corporation;  BERMITE RECOVERY, LLC, a Delaware limited liability company,<br><br>        Plaintiffs,<br><br>v.<br><br>CITY OF SANTA CLARITA, a California municipality and political subdivision,<br><br>        Defendant. | Adv. No: 2:21-ap-00178-MCW<br><br>**FIRST AMENDED COMPLAINT AND JURY DEMAND** |

For their First Amended Complaint ("Complaint"), Plaintiffs, Bermite Recovery, LLC., and Remediation Financial, Inc., hereby allege as follows:

## I.    CERTIFICATION OF COUNSEL

For purposes of Rule 11, *Fed. R. Civ. P.*, for and on behalf of Plaintiffs, Remediation Financial, Inc. and Bermite Recovery, LLC, undersigned counsel of

record do hereby adopt and ratify all allegations of the initial Complaint [Doc. 1] in this matter as if they had signed the initial Complaint. The following First Amended Complaint will now supersede the allegations of the initial Complaint. *See, Ramirez v. Cty. of San Bernardino*, 806 F.3d 1002, 1008 (9th Cir. 2015).

## II. <u>INTRODUCTION</u>

1. This case arises from Plaintiffs' valuable, vested property and liberty interests in a planned development of nearly 1,000 acres of real estate located in Santa Clarita, Los Angeles County, California ("the City"). Lacking any legitimate governmental interest or purpose, the City undertook a malicious, unconstitutional, and, regrettably, successful scheme to wrongfully (a) breach a long-standing Development Agreement with Plaintiffs; (b) interfere with Plaintiffs' reasonably assured and probable prospective business expectancies that would have enabled Plaintiffs to proceed with development; and (c) ultimately deprive Plaintiffs of their valuable vested property interests and liberty interests, in violation of Plaintiffs' federally guaranteed substantive and procedural due process rights.

2. As detailed below, the actions of the City were nothing short of an abject abuse of power. The actions of the City shock the conscience and far exceed all acceptable constitutional norms for how a municipal government should operate. Plaintiffs bring this action to hold the City accountable for its inexcusable, flagrant abuse of power that has deprived Plaintiffs of property worth no less than $750,000,000.

## III. <u>PARTIES, JURISDICTION, AND VENUE</u>

3. Plaintiff Remediation Financial, Inc. ("RFI") is an Arizona corporation with its principal place of business located in Maricopa County, Arizona, in this district. RFI is the sole member of Bermite. RFI is a non-debtor in the underlying bankruptcy case.

1          4.     RFI is also the sole member of Santa Clarita, LLC ("SCLLC"), an

2    Arizona limited liability company. SCLLC, the debtor in underlying bankruptcy

3    case, is no longer a party to this action.

4          5.     Plaintiff Bermite Recovery, LLC ("Bermite") is a Delaware limited

5    liability company with it principal place of business located in Maricopa County,

6    Arizona, in this district. Bermite is a non-debtor in the underlying bankruptcy case.

7    Bermite is named as a Plaintiff in this case (1) because it retained vested rights and

8    entitlements as an owner of a portion of the real property involved in this case, as

9    described below; and (2) to the extent it otherwise retained rights in the Specific

10   Plan, Development Agreement, and Vested Tentative Tract Map No. 51599

11   ("VTTM"),  as described below.

12         6.     As alleged below, Plaintiffs' business expectancies were centered in the

13   state of Arizona.

14         7.     Plaintiffs suffered its damages alleged herein within the state of

15   Arizona.

16         8.     Defendant, the City, is a California municipal corporation and political

17   subdivision located in Los Angeles County, California. As alleged herein, the City

18   has caused acts or events to occur in Arizona and this district out of which Plaintiffs'

19   claims arise.  This Court has personal jurisdiction over the City.

20         9.     At the time of the filing of the original complaint in this case, this Court

21   had subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 157(b)(2)(A)

22   and (O) and 28 U.S.C. § 1334. However, as a result of events and settlements

23   transpiring in the underlying bankruptcy case, Plaintiffs' claims asserted herein are

24   now non-core claims and unrelated to the underlying bankruptcy.  Consequently,

25   the bankruptcy court lacks subject matter jurisdiction over this case. Plaintiffs shall

26   promptly file a Motion to Withdraw the Reference in this case.

10. This district court has subject matter jurisdiction over Count One pursuant to 28 U.S.C. § 1331 and 28 U.S.C. §1343(a)(3), inasmuch as Count One arises under the United States Constitution and 42 U.S.C. § 1983.

11. This district court has subject matter jurisdiction over Counts Two through Five pursuant to 28 U.S.C. § 1332, inasmuch as there is complete diversity and the amount in controversy exceeds $75,000 as to each claim.

12. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)3).

## IV.  GENERAL FACTUAL BACKGROUND

### A.  The Property, the Project, and Vested Entitlements.

13. The history of this case revolves around two parcels of undeveloped real estate located in the City. One parcel consists of approximately 972 acres located at 221116 Soledad Canyon Road in the City ("parcel A"). The second parcel, adjacent to parcel A, contains approximately 24 acres ("parcel B"). Together, parcel A and Parcel B shall be referred to in this Complaint as "the Property."

14. From 1942 to 1967, the Bermite Powder Company ("BPC") owned the Property and operated its business there, manufacturing flares, photoflash bombs for battlefield illumination, explosives, detonators, fuses, boosters, coated magnesium, and stabilized red phosphorus. In 1967, the Whittaker Corporation (Whittaker") bought BPC and took over the Property, continuing thereafter to manufacture, test, and store munitions on the Property until 1987.

15. As a result of the activities of BPC and Whittaker, the Property became environmentally contaminated. In November 1994, the California Department of Toxic Substance Control ("DTSC") issued a consent order requiring remedial measures and additional reporting by Whittaker.

16. In May of 1995, the Santa Clarita City Council approved the Porta Bella Specific Plan ("the Specific Plan"), creating vested land use entitlements on the

Property and designating the Property Specific Plan. In short, the purpose and effect of the Porta Bella Specific Plan was to entitle a master planned community ("the Project") on the Property. A true and correct copy of the Specific Plan is attached hereto as **Exhibit 1** and incorporated herein by reference.

17. In March of 1996, Whittaker and the City executed a "Development Agreement" ("Development Agreement") that, among other things, expressly granted to Whittaker, as the developer, the vested right and legal entitlement to develop the Project on the Property pursuant to the Specific Plan and the Development Agreement. A true and correct copy of the Development Agreement is attached hereto as **Exhibit 2** and incorporated herein by reference.

18. Both Parcel A and Parcel B were included in and covered by the provisions and vested rights and entitlements in the Specific Plan, the Development Agreement, and the VTTM.

19. The Development Agreement expressly provided that its provisions "shall constitute covenants running with the Property for the benefit thereof, and the burdens and benefits created hereby shall bind and inure to the benefit of all assigns, transferees and successors to the parties hereto." (See Section 8(d)). Thus, the vested rights end development entitlements under the Specific Plan and the Development Agreement ran with the land and attached to parcel A and to parcel B.

20. The Development Agreement included an implied covenant of good faith and fair dealing that, among other things, required the City to refrain from actions that would undercut and prevent the developer from performing under the Development Agreement or receiving the benefits of that contract, including the benefits of the vested right to develop the Project on the Property.

21.   Unless extended under its terms of by mutual consent of the parties, the Development Agreement was to terminate January 1, 2021 ("DA termination date"). (See Section 7(i)) However, the vested rights and entitlements of the owner/developer under the Specific Plan had no termination date.

22.   The Development Agreement required the DA termination date to be automatically extended for the period of time of any actual delay resulting from various identified causes, including causes beyond the developer's control that prevent or interfere with the developer's performance under the Development Agreement. (See Sections 7(e) and (i)("the automatic extension clause")).

23.   The Development Agreement also contains the following contractual promise by the City:

> So long as Developer complies with the Applicable Rules, the City agrees that it will not unreasonably withhold from Developer, or unreasonably condition, any Discretionary Action or discretionary Approval granted by the City and required in order for the Project to proceed to construction, completion and occupancy.

(Development Agreement, Section 3(c)(iv)(4))

24.   At all relevant times, Plaintiffs were in compliance with the Applicable Rules.

**B.    RFI and Bermite Acquire Vested Rights and Entitlements.**

25.   In 1998, SCLLC acquired parcel A from Whittaker. As a result of that acquisition, SCLLC acquired all vested rights and entitlements for parcel A under the Specific Plan, the Development Agreement, and the VTTM.   Subsequently, Whittaker also formally assigned all of its rights and interests under the Development Agreement and Specific Plan to SCLLC. By means of its purchase of Parcel A and the assignment from Whittaker, SCLLC acquired all vested rights and entitlements under the Specific Plan, the Development Agreement, and the VTTM

to develop the Project on parcel A.

26. SCLLC borrowed money from Porta Bella Lender, LLC ("PBL") to complete the purchase, signing a loan agreement, promissory note, and deed of trust ("PBL loan documents").

27. Subsequently, SCLLC assigned all of its rights and interests in the Development Agreement and Specific Plan to RFI. By means of that assignment, RFI acquired all vested rights and entitlements under the Specific Plan, Development Agreement, and the VTTM to develop the Project on parcel A.

28. As a result of the Specific Plan, the Development Agreement, and the assignment from SCLLC, RFI had a property interest and liberty interest in the Development Agreement, Specific Plan, and the VTTM protected by the Fifth and Fourteenth Amendments to the United States Constitution.

29. In early 2000, Bermite acquired Parcel B from Soledad Canyon, LLC. As a successor to and transferee of Parcel B, Bermite acquired all vested rights and entitlements under the Specific Plan, Development Agreement, and the VTTM to develop the Project on Parcel B.

30. As a result of its purchase of Parcel B, the Specific Plan, and the Development Agreement, Bermite had a property interest and a liberty interest in Parcel B, the Development Agreement, the Specific Plan, and the VTTM protected by the Fifth and Fourteenth Amendments to the United States Constitution.

31. Bermite and SCLLC borrowed money from Kennedy Funding, Inc. ("KFI") to complete the purchase, signing a loan agreement, promissory note, and deed of trust ("KFI loan documents"). Subsequently, the KFI loan documents were acquired by and assigned to Steadfast Santa Clarita Holdings, LLC ("SSCH").

32. Subsequently, Bermite assigned its rights and interests under the Development Agreement and Specific Plan to RFI. By means of that assignment,

RFI acquired vested rights and entitlements under the Specific Plan, Development Agreement, and the VTTM to develop the Project on Parcel B. As a result of the Specific Plan, the Development Agreement, the VTTM, and the assignment, RFI had a property interest and a liberty interest in the Specific Plan, the Development Agreement, and the VTTM protected by the Fifth and Fourteenth Amendments to the United States Constitution.

33. Bermite retained its ownership rights in Parcel B. As a result, Bermite retained a property interest in Parcel B and the rights and entitlements under the Specific Plan attributable to that ownership. As a result, Bermite retained a property interest and a liberty interest protected by the Fifth and Fourteenth Amendments to the United States Constitution.

34. After Bermite and SCLLC acquired the Property, Bermite and RFI undertook the environmental clean-up on the Property, a lengthy and expensive process that necessarily delayed the actual development of the Property. During this time of environmental clean-up, RFI and Bermite continued their design and development strategies for the Project.

35. During this time, legal disputes further delayed Plaintiffs' actual development of the Project. In connection the acquisition of the Property, RFI had purchased environmental insurance through American International Specialty Lines Insurance Company and Zurich American Insurance Company. There was also historical environmental insurance in place through AIG.

36. Eventually, RFI began having issues with the environmental insurance companies. As a result, in 2004, RFI, SCLLC, and Bermite were forced to file bankruptcy. During the bankruptcy proceedings, the insurance companies settled, agreeing to pay their policy limits in connection with the remediation of the environmental contamination on the Property. Various other settlement

agreements were approved by the bankruptcy court before the bankruptcy petitions were dismissed in or around June 2012.

37. Following the dismissal of the bankruptcy petitions, RFI and Bermite continued their good faith efforts to develop the Property. However, the development process and recordation of the VTTM were put on hold until remediation was completed on the Property. Remediation on the Property was substantially completed in September 2019.

38. As a result of the lengthy period of time for remediation on the Property, the term of the Development Agreement and the DA termination date should have been extended for a corresponding period of time.

## C. **Plaintiffs Create a Bona Fide, Credible, Achievable Development Plan For the Project.**

39. Principals of the Plaintiffs are highly experienced, knowledgeable, and capable real estate developers. Their development plan for the Project was more than a mere hope and a dream. It was a bona fide, credible, achievable plan tailored to meet the requirements of the Development Agreement, the Specific Plan, and the VTTM. Plaintiffs' development plan was a reasonably probable and reasonably assured business expectancy of Plaintiffs.

40. Had the City not unlawfully interfered with Plaintiffs' efforts, as described below, it was reasonably probable and reasonably assured that Plaintiffs could have and would have (a) satisfied all requirements of the Development Agreement prior to the DA termination date; (b) obtained final approval of an amended Development Agreement and recorded the VTTM prior to the DA termination date; and (c) ultimately successfully completed the development of the Project thereafter.

41. In any event, had the City extended the DA termination date as requested by Plaintiffs and required by the Development Agreement (see below), it was reasonably probable and reasonably assured that Plaintiffs could have and would have (a) satisfied all requirements of the Development Agreement prior to the extended DA termination date; (b) obtained final approval of an amended Development Agreement and recorded the VTTM prior to the extended DA termination date; and (c) ultimately successfully completed the development of the Project thereafter.

42. Had Plaintiffs been allowed to complete the development of the Project, Plaintiffs would have earned net profits of no less than $750,000,000.

**D.** **Through an Unlawful Policy, the City Deliberately and Unlawfully Undercuts Plaintiffs' Development Plan in Order to Run Out the Clock on Plaintiffs' Vested Rights and Entitlements Under the Development Agreement, Specific Plan, and Vested Tentative Tract Map.**

43. In 2017, working together, Plaintiffs sought a joint venture partner or lender to obtain the capital necessary to pay off the then-current debt on the Property, pay all property taxes on the Property, and proceed with development of the Project pursuant to their development plan and their vested rights and entitlements under the Development Agreement, Specific Plan, and the VTTM.

44. However, unknown to Plaintiffs, at or about the time in 2017 when Plaintiffs began to negotiate with third-parties for financing to proceed with development of the Project, the City had knowingly, intentionally, and maliciously betrayed Plaintiffs, the Specific Plan, the Development Agreement, and the VTTM, including Plaintiffs' expressly granted and vested rights and entitlements to develop the Project according to the Specific Plan, the Development Agreement, and the VTTM.

45. The City's betrayal came in the form of a new City policy directed specifically at Plaintiffs. Unknown to Plaintiffs, but during the term of the Development Agreement, the City had devised and implemented a formal policy to (1) disavow the Specific Plan, the Development Agreement, and the VTTM; (2) disavow Plaintiffs' vested rights and entitlements under the Specific Plan, the Development Agreement, and the VTTM; (3) "run out the clock" on Plaintiffs' rights under the Development Agreement by thwarting and delaying Plaintiffs' efforts to obtain financing sufficient to fully perform under the Development Agreement by the DA termination date; the City planned and intended to do this by telling Plaintiffs' prospective business partners and lenders that Plaintiffs no longer held sufficient vested rights and entitlements in the Property and would have to start the entitlement process all over; and (4) favor Plaintiffs' lender as the new owner and developer of the Property and use its influence to cause Plaintiffs to lose any and all ownership rights in the Property. Plaintiffs shall hereinafter refer to this policy as "the Unlawful Policy."

**The Howard Hughes Corporation Opportunity**

46. On or about January 27, 2017, unaware of the City's Unlawful Policy, Plaintiffs and their affiliates entered into a letter of intent with The Howard Hughes Corporation ("HHC"). A true and correct copy of Plaintiffs' LOI with HHC ("HHC LOI") is attached hereto as **Exhibit 3** and incorporated herein by reference.

47. Under the HHC LOI, HHC and Plaintiffs planned to form a joint venture to acquire then-existing debt on the Property and proceed with the development of the Project on the Property.

48. As reflected in the HHC LOI, Plaintiffs had a bona fide, reasonably assured and probable business opportunity and expectancy in its relationship with HHC.

49.     After Plaintiffs and HHC signed the HHC LOI, HHC representatives communicated with representatives of the City's planning department about HHC's prospective relationship with Plaintiffs and about the Project and Plaintiffs' rights under the Development Agreement, Specific Plan, and the VTTM, including Plaintiffs' development plan.

50.     Acting pursuant to and to effectuate the City's Unlawful Policy, representatives of the City planning department told HHC that (1) Plaintiffs did not have valid vested rights and entitlements necessary to develop the Project; and (2) Project development at that point would require new entitlements and reports, including a new environmental impact report and would take several years. Representatives of the City's planning department also told HHC that the current Specific Plan was, in effect, no longer operative and needed to be replaced.

51.     Thus, acting pursuant to and to effectuate its Unlawful Policy, the City disavowed Plaintiffs' entitlements under the Specific Plan, Development Agreement, and the VTTM nearly four years before the stated DA termination date.

52.     The foregoing statements of the City to HHC were false.

53.     In light of the express terms of the Specific Plan and the Development Agreement, the City knew the statements to HHC were false.

54.     The City made the false statements to HHC intending to (1) mislead HHC about Plaintiffs' rights under the Development Agreement, the Specific Plan, and the VTTM; (2) convince HHC to discontinue its relationship with Plaintiffs; and (3) otherwise effectuate the City's Unlawful Policy.

55.     After the City made the foregoing false statements to HHC, HHC discontinued negotiations with Plaintiffs and refused to form the joint venture set forth in the HHC LOI. As a result, Plaintiffs lost the opportunity to obtain the necessary financing to continue and complete development of the Project on the

1    Property.

2    56.    The City's actions regarding HHC caused Plaintiffs significant delay in

3 implementing their development plan for the Project on the Property.

4                     **The Trumark Opportunity**

5    57.    On or about December 21, 2017, unaware of the City's Unlawful Policy,

6 Plaintiffs and Trumark Communities ("Trumark") signed a letter of intent

7 ("Trumark LOI") for the sale of the Property to Trumark for $80,150,000. A true

8 and correct copy of the Trumark LOI is attached hereto as **Exhibit 4** and

9 incorporated herein by reference. However, the opportunity for Plaintiffs to do

10 business with Trumark included the alternative option of forming a joint venture

11 with Trumark to obtain the necessary financing to continue and complete Plaintiffs'

12 development plan for the Project on the Property.

13    58.    As reflected in the Trumark LOI, Plaintiffs had a bona fide, reasonably

14 assured and probable business opportunity and expectancy in its relationship with

15 Trumark.

16    59.    After Plaintiffs and Trumark signed the Trumark LOI, Trumark

17 representatives communicated with representatives of the City's planning

18 department about Trumark's prospective relationship with Plaintiffs and about the

19 Project and Plaintiffs' rights under the Development Agreement, the Specific Plan,

20 and the VTTM, including Plaintiffs' development plan.

21    60.    Acting pursuant to and to effectuate the City's Unlawful Policy,

22 representatives of the City planning department told Trumark that (1) Plaintiffs did

23 not have valid vested rights and entitlements necessary to develop the Project; and

24 (2) Project development at that point would require new entitlements and reports,

25 including a new environmental impact report and would take several years.

26 Representatives of the City's planning department also told Trumark that the

current Specific Plan was, in effect, no longer operative and needed to be replaced.

61. Thus, acting pursuant to and to effectuate its Unlawful Policy, the City disavowed Plaintiffs' entitlements under the Specific Plan, Development Agreement, and the VTTM approximately three years before the stated DA termination date.

62. The foregoing statements of the City to Trumark were false.

63. In light of the express terms of the Specific Plan and the Development Agreement, the City knew the statements to Trumark were false.

64. The City made the false statements to Trumark intending to (1) mislead Trumark about Plaintiffs' rights under the Development Agreement, the Specific Plan, and the VTTM; (2) convince Trumark to discontinue its relationship with Plaintiffs; and (3) otherwise effectuate the City's Unlawful Policy.

65. After the City made the foregoing false statements to Trumark, Trumark discontinued negotiations with Plaintiffs. As a result, Plaintiffs lost the opportunity to obtain the necessary financing to continue and complete development of the Project on the Property.

66. The City's actions regarding Trumark caused Plaintiffs significant delay in implementing their development plan for the Project on the Property.

**The Pivotal Group Opportunity**

67. In approximately April 2018, unaware of the City's Unlawful Policy, Plaintiffs began negotiations with Pivotal Group ("Pivotal"), headquartered in Phoenix, Arizona, for a proposed joint venture to finance and develop the Project on the Property. Those negotiations resulted in a signed letter of intent between Plaintiffs and Pivotal dated April 20, 2018. ("Pivotal LOI"). A true and correct copy of the Pivotal LOI is attached hereto as **Exhibit 5** and incorporated herein by reference.

68.     Pursuant to the Pivotal LOI, Pivotal anticipated an equity investment in the joint venture with Plaintiffs in the amount of approximately $57.31 million.

69.     As reflected in the Pivotal LOI, Plaintiffs had a bona fide, reasonably assured and probable business opportunity and expectancy in its relationship with Pivotal.

70.     After Plaintiffs and Pivotal signed the Pivotal LOI, Pivotal representatives communicated with representatives of the City's planning department about Pivotal's prospective relationship with Plaintiffs and about the Project and Plaintiffs' rights under the Development Agreement, the Specific Plan, and the VTTM, including Plaintiffs' development plan.

71.     Acting pursuant to and to effectuate the City's Unlawful Policy, representatives of the City planning department told Pivotal that (1) Plaintiffs did not have valid vested rights and entitlements necessary to develop the Project; and (2) Project development at that point would require new entitlements and reports, including a new environmental impact report and would take several years. Representatives of the City's planning department also told Pivotal that the current Specific Plan was, in effect, no longer operative and needed to be replaced.

72.     Thus, acting pursuant to and to effectuate its Unlawful Policy, the City disavowed Plaintiffs' entitlements under the Specific Plan, Development Agreement, and the VTTM approximately three years before the stated DA termination date.

73.     The City's statements to Pivotal were false.

74.     In light of the express terms of the Specific Plan and the Development Agreement, the City knew the statements to Pivotal were false.

75.     The City made the false statements to Pivotal intending to (1) mislead Pivotal about Plaintiffs' rights under the Development Agreement, the Specific Plan,

and the VTTM; (2) convince Pivotal to discontinue its relationship with Plaintiffs; and (3) otherwise effectuate the City's Unlawful Policy.

76. After the City made the foregoing false statement to Pivotal, Pivotal refused to continue with the joint venture with Plaintiffs envisioned in the Pivotal LOI and ceased all negotiations with Plaintiffs.

77. The City's actions regarding Pivotal caused Plaintiffs significant delay in implementing their development plan for the Project on the Property.

### The Silver Arch Opportunity

78. During 2018, unaware of the City's Unlawful Policy, Plaintiffs began negotiations with Silver Arch Capital Partners ("Silver Arch") for Silver Arch to provide a loan to Plaintiffs in the amount of $48 million to enable Plaintiffs to develop the Project on the Property. Those negotiations resulted in a signed letter of intent between Plaintiffs and Silver Arch dated November 27, 2018. ("Silver Arch LOI"). A true and correct copy of the Silver Arch LOI is attached hereto as **Exhibit 6** and incorporated herein by reference.

79. As reflected in the Silver Arch LOI, Plaintiffs had a bona fide, reasonably assured and probable business opportunity and expectancy in its relationship with Silver Arch.

80. After Plaintiffs and Silver Arch signed the Silver Arch LOI, Silver Arch hired Newmark Knight Frank Valuation & Advisory, LLC ("NKF") to develop an appraisal of the Property. In the process of conducting that appraisal, as reflected in NKF's January 4, 2019, appraisal report, NKF spoke with representatives of the City's planning department about Silver Arch's prospective relationship with Plaintiffs and about the Project and Plaintiffs' rights under the Development Agreement, the Specific Plan, and the VTTM, including Plaintiffs' development plan.

81. Acting pursuant to and to effectuate the City's Unlawful Policy, representatives of the City planning department told NKF that (1) Plaintiffs did not have valid vested rights and entitlements necessary to develop the Project; and (2) Project development at that point would require new entitlements and reports, including a new environmental impact report and would take several years. Representatives of the City's planning department also told NKF that the current Specific Plan was, in effect, no longer operative and needed to be replaced.

82. Thus, acting pursuant to and to effectuate its Unlawful Policy, the City disavowed Plaintiffs' entitlements under the Specific Plan, Development Agreement, and the VTTM two years before the stated DA termination date.

83. The foregoing statements of the City to NKF were false.

84. In light of the express terms of the Specific Plan and the Development Agreement, the City knew the statements to NKF were false.

85. The City made the false statements to NKF intending to (1) mislead NKF and Silver Arch about Plaintiffs' rights under the Development Agreement, the Specific Plan, and the VTTM; (2) convince Silver Arch to discontinue its relationship with Plaintiffs; and (3) otherwise effectuate the City's Unlawful Policy.

86. After the City made the foregoing false statements to NKF, and after NKF reported them in NKF's January 4, 2019, appraisal report to Silver Arch, Silver Arch discontinued negotiations with Plaintiffs and refused to fund the loan to Plaintiffs that was the subject of the Silver Arch LOI. As a result, Plaintiffs lost the opportunity to obtain the necessary financing to continue and complete development of the Project on the Property.

87. The City's actions regarding NKF and Silver Arch caused Plaintiffs significant delay in implementing their development plan for the Project on the Property.

## The Romspen Opportunity

88. Unaware of the City's Unlawful Policy, on or about August 28, 2019, Plaintiffs signed a letter of intent with Romspen Investment Corporation ("Romspen") anticipating a loan from Romspen in the amount of $74,500,00 intended to pay of existing debt on the Property and provide for development costs on the Project ("Romspen LOI"). A true and correct copy of the Romspen LOI is attached hereto as **Exhibit 7** and incorporated herein by reference.

89. As reflected in the Romspen LOI, Plaintiffs had a bona fide, reasonably assured and probable business opportunity and expectancy in its relationship with Romspen.

90. After Plaintiffs and Romspen signed the Romspen LOI, Romspen representatives communicated with representatives of the City's planning department about Romspen's prospective relationship with Plaintiffs and about the Project and Plaintiffs' rights under the Development Agreement, Specific Plan, and the VTTM, including Plaintiffs' development plan.

91. Acting pursuant to and to effectuate the City's Unlawful Policy, representatives of the City planning department told Romspen that (1) Plaintiffs did not have valid vested rights and entitlements necessary to develop the Project; and (2) Project development at that point would require new entitlements and reports, including a new environmental impact report and would take several years. Representatives of the City's planning department also told Romspen that the current Specific Plan was, in effect, no longer operative and needed to be replaced.

92. Thus, acting pursuant to and to effectuate its Unlawful Policy, the City disavowed Plaintiffs' entitlements under the Specific Plan, Development Agreement, and the VTTM more than a year before the stated DA termination date.

93. The City's statements to Romspen were false.

94. In light of the express terms of the Specific Plan and the Development Agreement, the City knew the statements to Romspen were false.

95. The City made the false statements to Romspen intending to (1) mislead Romspen about Plaintiffs' rights under the Development Agreement, the Specific Plan, and the VTTM; (2) convince Romspen to discontinue its relationship with Plaintiffs; and (3) otherwise effectuate the City's Unlawful Policy.

96. After the City made the foregoing false statement to Romspen, Romspen ceased negotiations with Plaintiffs over the subject of the Romspen LOI.

97. The City's actions regarding Romspen caused Plaintiffs significant delay in implementing their development plan for the Project on the Property.

### Clarion Capital Partners, LLC Opportunity

98. In approximately August 2019, Plaintiffs began negotiations with Clarion Capital Partners, LLC ("Clarion") to obtain a loan sufficient to enable Plaintiffs to develop the Project on the Property or to form a joint venture with Clarion.

99. The opportunity to obtain financing from, or form a joint venture with, Clarion was a bona fide, reasonably assured and probable business opportunity and expectancy of Plaintiffs.

100. After Plaintiffs and Clarion began negotiating, Clarion representatives communicated with representatives of the City's planning department about Clarion's prospective relationship with Plaintiffs and about the Project and Plaintiffs' rights under the Development Agreement, Specific Plan, and the VTTM, including Plaintiffs' development plan.

101. Acting pursuant to and to effectuate the City's Unlawful Policy, representatives of the City planning department told Clarion that (1) Plaintiffs did not have valid vested rights and entitlements necessary to develop the Project; and

(2) Project development at that point would require new entitlements and reports, including a new environmental impact report and would take several years. Representatives of the City's planning department also told Clarion that the current Specific Plan was, in effect, no longer operative and needed to be replaced.

102.  Thus, acting pursuant to and to effectuate its Unlawful Policy, the City disavowed Plaintiffs' entitlements under the Specific Plan, Development Agreement, and the VTTM more than a year before the stated DA termination date.

103.  The City's statements to Clarion were false.

104.  In light of the express terms of the Specific Plan and the Development Agreement, the City knew the statements to Clarion were false.

105.  The City also made false and derogatory statements to Clarion about the principals of Plaintiffs, intending to further discourage Clarion from doing business with Plaintiffs.

106.  The City made the false statements to Clarion intending to (1) mislead Clarion about Plaintiffs' rights under the Development Agreement, the Specific Plan, and the VTTM; (2) convince Clarion to discontinue its relationship with Plaintiffs; and (3) otherwise effectuate the City's Unlawful Policy.

107.  After the City made the foregoing false statement to Clarion, Clarion ceased negotiations with Plaintiffs about providing financing to Plaintiffs for the Project on the Property.

108.  The City's actions regarding Clarion caused Plaintiffs significant delay in implementing their development plan for the Project on the Property.

**E.**  **The City Interferes With Other Opportunities of Plaintiffs Arising Out of Plaintiffs' Vested Rights and Entitlements in the Property.**

109.  During the period of time set forth above when the City was interfering with Plaintiffs' reasonably probable as assured business expectancies with

prospective lenders and joint venture partners, the City also became aware of Plaintiffs' reasonably probable and assured business expectancies with KB Homes and Spirit Properties, two companies with the interest and ability to acquire a portion of the Property from Plaintiffs and construct, market, and sell homes within the Project. A true and correct copy of Plaintiffs' letters of intent with KB Homes and Spirit Properties are attached hereto as **Exhibits 8 and 9** and incorporated herein by reference.

110. The City knew and intended that by preventing Plaintiffs from acquiring the necessary financing for development of the Project, the City could likewise prevent Plaintiffs from consummating any transaction with KB Homes and Spirit Properties.

111. As a result of the City's interference with Plaintiffs' prospective lenders and joint venture partners as described above, and acting pursuant to and to effectuate its Unlawful Policy, the City caused Plaintiffs to lose their valid business expectancies with KB Homes and Spirit Properties.

F. **The City's Interference With Plaintiffs' Business Expectancies Was An Integral Part of Its Unlawful Policy and Constituted a Continuing Violation.**

112. The City's intentional interference with Plaintiffs' known business expectancies was an integral part of the City's Unlawful Policy. Indeed, it was by interfering with Plaintiffs' business expectancies that the City intended to "run out the clock" on Plaintiffs' performance under the Development Agreement and Plaintiffs' development plan.

113. Thus, each act of wrongful interference by the City was a related and intended part of the City's scheme and plan to deprive Plaintiffs of their vested rights and entitlements in the Development Agreement, Specific Plan, the VTTM, and Plaintiffs' development plan.

114. Each act of the City's wrongful interference thus constituted an intended component part of a continuing violation, culminating in the January 1, 2021, termination of the Development Agreement, subsequent threatened loss of Plaintiffs' ownership rights in the Property, and the resulting devastating financial damage to Plaintiffs.

### G. The City Sends a Deceptive Letter to Plaintiffs Purporting to Confirm Plaintiffs' Vested Rights Under the Development Agreement and the Specific Plan.

115. As they continued to experience a loss of prospective lenders, joint venture partners, and other business expectancies, Plaintiffs became concerned about the January 1, 2021, DA termination date.

116. To reassure prospective lenders and business partners of their rights, on October 22, 2020, Plaintiffs made a formal written request to the City to confirm Plaintiffs' rights in the Development Agreement and to further confirm that Plaintiffs were not in default under that agreement.

117. In response, the City sent to Plaintiffs a written letter dated November 4, 2019 ("Confirmation Letter"). In the Confirmation Letter, the City confirmed that the Development Agreement remained in effect and that the City was not aware of any defaults under that agreement.

118. At the time Plaintiffs received the Confirmation Letter, they were unaware of the City's Unlawful Policy.

119. The Confirmation Letter accurately states the status of the Development Agreement. Of course, the City did not disclose in the Confirmation Letter that it had created and instituted the Unlawful Policy.

120. The City sent the Confirmation Letter to Plaintiffs to conceal the Unlawful Policy from Plaintiffs.

121. As a result of the Confirmation Letter, Plaintiffs justifiably had no reason to suspect the existence of the Unlawful Policy.

**H.** **Plaintiffs Learn of the Unlawful Policy, Unsuccessfully Seek an Extension of the Development Agreement, and Declare the City in Default of the Development Agreement.**

122. In early 2020, Plaintiffs submitted a public records request to the City. Forced by law to now disclose communications and documents previously hidden from public view, in approximately May of 2020 the City provided Plaintiffs with documents reflecting the existence and operation of the Unlawful Policy.

123. Consequently, on July 23, 2020, Plaintiffs sent a Request For Time Extension to the City, asking for an additional five years to be added to the Development Agreement.

124. On August 7, 2020, pursuant to and to effectuate the Unlawful Policy, and in a flagrant, bad faith breach of the Development Agreement, the City refused to agree to the requested extension of the Development Agreement.

125. Thereafter, Plaintiffs requested further discussions with the City to discuss the need for the extension. Plaintiffs and the City had a subsequent discussion about the extension on August 17, 2020, without resolution.

126. On October 15, 2020, Plaintiffs sent a written notice of default to the City. A true and correct copy of the notice of default is attached hereto as **Exhibit 10** and incorporated herein by reference.

127. On November 12, 2020, Plaintiffs and the City discussed Plaintiffs' notice of default and the City's denial of the requested extension. During that conversation, Plaintiffs discussed with the City how the City's interference with Plaintiffs prospective lenders and joint venture partners caused delay in Plaintiffs development plan and how an extension was therefore required by the Development

Agreement. Despite Plaintiffs reasonable and appropriate request for the extension, on November 12, 2020, the City made its final decision denying Plaintiffs' request.

128. By refusing Plaintiffs' requested extension, and by failing to extend the term of the Development Agreement based upon the lengthy remediation period on the Property, the City breached the Development Agreement, including but not limited to the express and implied covenants of good faith and fair dealing.

129. Moreover, knowing that the DA termination date was approximately 50 days away from the November 12, 2020, denial date, the City denied Plaintiffs' request for an extension in order to carry out its Unlawful Policy.

130. As a result of the City's unlawful and unreasonable refusal to grant Plaintiffs' requested extension for the Development Agreement, the Development Agreement wrongfully terminated on January 1, 2021, causing damage to Plaintiffs.

**I.  The City's Interference With Plaintiffs' Business Expectancies Continued Even After the January 1. 2021, Termination of the Development Agreement.**

131. Even after the termination of the Development Agreement, the City knew that Bermite continued to have ownership rights in Parcel B. In order to successfully and fully carry out the Unlawful Policy, the City knew that it would have to take action designed to deprive Bermite of that ownership interest. To ensure that result, and to fully execute the City's Unlawful Policy, the City continued to unlawfully interfere with Plaintiffs' reasonably probable and assured business expectancies.

**The Greenlaw Opportunity**

132. On March 2, 2022, Bermite and SCLLC signed a letter of intent with Greenlaw Partners ("Greenlaw"). Under that letter of intent ("Greenlaw LOI"), Greenlaw would purchase Parcel B from Bermite for $70 per land square foot. A true and correct copy of the Greenlaw LOI is attached hereto as **Exhibit 11** and

incorporated herein by reference.

133. The City was aware of the Greenlaw LOI.

134. Upon information and belief, Plaintiffs allege that the City communicated with Greenlaw about the LOI and informed Greenlaw that (1) Plaintiffs did not have valid vested rights and entitlements necessary to develop the Project; and (2) Project development at that point would require new entitlements and reports, including a new environmental impact report and would take several years. Representatives of the City's planning department also told Greenlaw that the current Specific Plan was, in effect, no longer operative and needed to be replaced.

135. The City made the foregoing statements to Greenlaw in order to carry out the City's Unlawful Policy.

136. As a result of the City's communication to Greenlaw, Greenlaw discontinued its negotiations with Bermite under the Greenlaw LOI, depriving Bermite of the value of Parcel B.

## The Juniper Opportunity

137. In March of 2022, Plaintiffs signed a letter of intent with Juniper Real Estate, LLC ("Juniper"). Under that letter of intent ("Juniper LOI"), Juniper, RFI, and Bermite would form a joint venture that would retire debt and provide working capital to Plaintiffs for the development of the Project. A true and correct copy of the Juniper LOI is attached hereto as **Exhibit 12** and incorporated herein by reference.

138. The City was aware of the Juniper LOI.

139. The City communicated with Juniper about the Project and informed Juniper that (1) Plaintiffs did not have valid vested rights and entitlements necessary to develop the Project; and (2) Project development at that point would

require new entitlements and reports, including a new environmental impact report and would take several years. Representatives of the City's planning department also told Juniper that the current Specific Plan was, in effect, no longer operative and needed to be replaced.

140.   The City made the foregoing statements to Juniper in order to carry out the City's Unlawful Policy.

141. As a result of the City's communication to Juniper, Juniper discontinued its negotiations with Plaintiffs under the Juniper LOI, depriving Bermite of the value of Parcel B.

142.   Subsequently, in April 2022, the bankruptcy court approved the sale of the Property to Plaintiffs' lender, including Parcel B.

143.   As a result of the foregoing, and pursuant to the City's purpose in creating and implementing the Unlawful Policy, Plaintiffs' vested rights and entitlements in the Development Agreement, Specific Plan, and the VTTM have reverted to the City for public use.  That public use consists of the City's intended modification or amendment of the Specific Plan, Development Agreement, and the VTTM, and the granting of vested rights and entitlements thereunder to another owner/developer.

### **Plaintiffs' Notice of Claim**

144.   On December 7, 2020, Plaintiffs submitted to the City a Notice of Claim pursuant to the California Governmental Claims Act. A true and correct copy of that Notice of Claim is attached hereto as **Exhibit 13** and incorporated herein by reference.

145.   Plaintiffs have complied with any and all other conditions precedent to bringing this Complaint.

## V.   **CLAIMS FOR RELIEF**

### **COUNT ONE**

### **(42 U.S.C. § 1983)**

146.   Plaintiffs incorporate herein all foregoing paragraphs of this Complaint.

147.   As alleged herein, Plaintiffs had a vested, protectible property interest in the Property.

148.   As alleged herein, Plaintiffs had a vested, protectible property interest in the Development Agreement, the Specific Plan, and the VTTM, including the vested rights and entitlements thereunder.

149.   As alleged herein, as a result of their ownership of the Property, the Development Agreement, the Specific Plan, the VTTM, and the vested rights and entitlements thereunder, Plaintiffs had a protectible property interest in their development plan for the Project on the Property.

150.   As alleged herein, Plaintiffs had a protectible liberty interest in the ownership of the Property, the Development Agreement, the Specific Plan, the VTTM, and the vested rights and entitlements thereunder.  That protectible liberty interest includes the right to make and carry out contracts granting vested rights and entitlements, including the right to carry out and benefit from Plaintiffs' development plan for the Project on the Property.

151.   Acting under color of state law and by means of the Unlawful Policy and its arbitrary, unreasonable, and unlawful conduct alleged herein, the City deprived Plaintiffs of their protectible property interests and liberty interests without procedural due process of law, in violation of 42 U.S.C. § 1983.

152.   As alleged herein, the City's conduct was arbitrary, capricious, malicious, and otherwise manifestly unreasonable.

153. As alleged herein, the City's conduct exceeded all bounds of proper, legitimate governmental action, served no legitimate governmental purpose, constituted a malicious abuse of governmental authority and power, and otherwise shocks the conscience.

154. Based on the foregoing, acting under color of state law and by means of the Unlawful Policy and its arbitrary, unreasonable, and unlawful conduct alleged herein, the City deprived Plaintiffs of their protectible property interests and liberty interests in violation of their substantive due process rights, in violation of 42 U.S.C. § 1983.

155. The first deprivation of Plaintiffs' protectible property interests and liberty interests in violation of their substantive and procedural due process rights occurred on January 1, 2021, when the Development Agreement terminated.

156. The second deprivation of Plaintiffs' protectible property interests and liberty interest in violation of their substantive and procedural due process rights occurred in April 2022, when the bankruptcy court approved the sale of Parcel B.

157. As a direct and proximate result of the City's wrongful conduct alleged herein, Plaintiffs have been damaged in an amount not less than $750,000,000.

Wherefore, Plaintiffs pray for judgment against the City as follows:

A. For actual, direct, and consequential damages in an amount to be established by the jury at trial, but in no event less than $750,000,000;

B. For Plaintiffs' costs and reasonable attorney's fees under 42 U.S.C. § 1988; and

C. For all other relief justified under the circumstances of this case.

# COUNT TWO

**(Tortious Interference With Prospective Economic Advantage)**

158. Plaintiffs incorporate herein all foregoing paragraphs of this Complaint.

159. As alleged herein, Plaintiffs had bona fide, reasonably assured and probable business opportunities and expectancies with lenders and joint venture partners.

160. At all relevant times, as alleged herein, the City was aware of those bona fide, reasonably assured and probable business opportunities and expectancies with lenders and joint venture partners.

161. As alleged herein, Plaintiffs had a bona fide, reasonably assured and probable business opportunity and expectancy in Plaintiffs' development plan for the Project on the Property.

162. At all relevant times, as alleged herein, the City was aware of Plaintiffs bona fide, reasonably assured and probable business opportunity and expectancy in Plaintiffs' development plan for the Project on the Property.

163. Through the independently wrongful conduct alleged herein, the City knowingly, intentionally, maliciously, and wrongfully interfered with Plaintiffs' bona fide, reasonably assured and probable business opportunities and expectancies.

164. As a direct and proximate result of the City's wrongful conduct alleged herein, Plaintiffs have been damaged in an amount not less than $750,000,000.

165. The City acted intentionally, knowingly, and with actual malice, justifying the imposition of punitive damages.

Wherefore, Plaintiffs pray for judgment against the City as follows:

A. For actual, direct, and consequential damages in an amount to be established by the jury at trial, but in no event less than $750,000,000;

1    B.    For punitive damages in an amount to be established in the sound

2          discretion of the jury;

3    C.    For Plaintiffs' costs and reasonable attorney's fees; and

4    D.    For all other relief justified under the circumstances of this case.

## COUNT THREE

### (Breach of Contract)

166. Plaintiffs incorporate herein all foregoing paragraphs of this Complaint.

167. As alleged herein, the City owed Plaintiffs contractual duties under the Development Agreement.

168. As alleged herein, the City breached the Development Agreement.

169. As a direct and proximate result of the City's breach of contract, Plaintiffs have been damaged in an amount not less than $750,000,0000.

Wherefore, Plaintiffs pray for judgment against the City as follows:

A.    For actual, direct, and consequential damages in an amount to be established by the jury at trial, but in no event less than $750,000,000;

B.    For Plaintiffs' costs and reasonable attorney's fees; and

C.    For all other relief justified under the circumstances of this case.

## COUNT FOUR

### (Breach of Implied Covenant of Good Faith and Fair Dealing)

170. Plaintiffs incorporate herein all foregoing paragraphs of this Complaint.

171. As alleged herein, the Development Agreement contained an implied covenant of good faith and fair dealing that (1) prohibited the City from engaging in conduct that prevented Plaintiffs from performing under the Development Agreement, including the performance of Plaintiffs' development plan for the Project on the Property; and (2) required the City to extend the term of the Development Agreement by at least five years to January 1, 2026, as a result of the City's actions

30

1    pursuant to the Unlawful Policy.

2        172.  As alleged herein, the City breached the implied covenant of good faith

3    and fair dealing in the Development Agreement.

4        173.  As a direct and proximate result of the City's breach of the implied

5    covenant of good faith and fair dealing, Plaintiffs have been damaged in an amount

6    not less than $750,000,0000.

7        Wherefore, Plaintiffs pray for judgment against the City as follows:

8    A.    For actual, direct, and consequential damages in an amount to be

9          established by the jury at trial, but in no event less than $750,000,000;

10   B.    For Plaintiffs' costs and reasonable attorney's fees; and

11   C.    For all other relief justified under the circumstances of this case.

12                              **COUNT FIVE**

13                        **(Inverse Condemnation)**

14       174.  Plaintiffs incorporate herein all foregoing paragraphs of this Complaint.

15       175.  The City's conduct in interfering with and depriving Plaintiffs' of their

16   vested property rights, interests, and entitlements in the Property, the Development

17   Agreement, the Specific Plan, the VTTM, and Plaintiffs' development plan

18   constitutes an unlawful physical taking for public use without just compensation, in

19   violation of Plaintiffs' constitutionally protected rights under the Fifth and

20   Fourteenth Amendments to the United States Constitution and Article 1, § 19 of the

21   California Constitution.

22       176.  As a result of the City's inverse condemnation, Plaintiffs have suffered

23   damage to their property in an amount not less than $750,000,000.

24       177.  Plaintiffs' claim for inverse condemnation is ripe for adjudication.

25       Wherefore, Plaintiffs pray for judgment against the City as follows:

26   A.    For just compensation for the City's physical taking of Plaintiffs'

| | |
|---|---|
| 1 | property, in an amount to be established by the jury at trial, but in no |
| 2 | event less than $750,000,000; |
| 3 | B. For Plaintiffs' costs and reasonable attorney's fees; and |
| 4 | C. For all other relief justified under the circumstances of this case. |
| 5 | Dated: May 4, 2022        SMITH LC |

Dated: May 4, 2022                SMITH LC

By: /s/ Richard R. Thomas
    Richard R. Thomas, AZ Bar No. 010484
    40 North Center Street, Suite 104
    Mesa, AZ 85201
    E: rthomas@smith-lc.com

THE BURGESS LAW GROUP

    Todd Burgess
    Lindsi Weber
    3131 E. Camelback Rd., Suite 224
    Phoenix, AZ 85016
    E: Todd@theburgesslawgroup.com
    E: Lindsi@theburgesslawgroup.com

*Attorneys for Plaintiffs, Bermite Recovery, LLC and Remediation Financial, Inc.*

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b), *Fed. R. Civ. P.*, Plaintiffs, Bermite Recovery, LLC., and Remediation Financial, Inc., hereby demand trial by jury herein on all issues so triable.

Dated: May 4, 2022                 SMITH LC

By: /s/ Richard R. Thomas
     Richard R. Thomas, AZ Bar No. 010484
     40 North Center Street, Suite 104
     Mesa, AZ 85201
     E: rthomas@smith-lc.com

     Todd Burgess
     Lindsi Weber
     THE BURGESS LAW GROUP
     3131 E. Camelback Rd., Suite 224
     Phoenix, AZ 85016
     E: Todd@theburgesslawgroup.com
     E: Lindsi@theburgesslawgroup.com

*Attorneys for Plaintiffs Bermite Recovery, LLC and Remediation Financial, Inc.*